1  ANNE RICHARDSON – SBN 151541
2  arichardson@publiccounsel.org
   MAGDALENA REYES BORDEAUX – SBN 195671
3  mbordeaux@publiccounsel.org
4  CHARLES EVANS – SBN 251780
   cevans@publiccounsel.org
5  L. ADELAIDE ANDERSON – SBN 270966
6  aanderson@publiccounsel.org
   PUBLIC COUNSEL
7  610 South Ardmore Avenue
8  Los Angeles, CA 90005
   Tel.:  (213) 385-2977 | Fax:  (213) 385-9089
9

10 *Counsel for Plaintiff and Proposed Classes*
   [Additional Counsel List Follows Caption]
11

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| DEBORAH TERRELL, an individual, on behalf of herself and similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>UNIVERSITY ACCOUNTING SERVICE, LLC; a Wisconsin limited liability company; BALBOA STUDENT LOAN TRUST, a Delaware statutory trust; TURNSTILE CAPITAL MANAGEMENT, a Delaware limited liability company; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br>1) Class Violations of the Fair Debt Collection Practices Act;<br>2) Class Violations of the Rosenthal Fair Debt Collection Practices Act;<br>3) Class Violations of the Consumer Legal Remedies Act;<br>4) Class Violations of Cal. Bus. & Prof. Code § 17200, *et seq*.;<br>5) Declaratory Judgment under 28 U.S.C. § 2201;<br>6) Individual Violations of the Fair Debt Collection Practices Act; and<br>7) Individual Violations of the Rosenthal Fair Debt Collection Practices Act.<br><u>JURY TRIAL DEMANDED</u> |

*Additional Counsel for Plaintiff and Proposed Classes*

FREDRIC D. WOOCHER – SBN 96689
fwoocher@strumwooch.com
JENNA L. MIARA – SBN 305703
jmiara@strumwooch.com
DALE LARSON – State Bar No. 266165
dlarson@strumwooch.com
STRUMWASSER & WOOCHER LLP
10940 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Tel.: (310) 576-1233 | Fax: (310) 319-0156

DAN STORMER – SBN 101967
dstormer@hadsellstormer.com
CAITLAN MCLOON - SBN 302798
cmcloon@hadsellstormer.com
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Tel.: (626) 585-9600 | Fax: (626) 577-7079

Plaintiff Deborah Terrell brings this proposed class action against University Accounting Service, LLC ("UAS"), the Balboa Student Loan Trust ("Balboa"), and Turnstile Capital Management, LLC ("Turnstile"), individually and on behalf of all similarly situated individuals ("Class Members") who were fraudulently induced to take out student loans now owned and serviced by Defendants.  Plaintiff alleges that Defendants' efforts to collect on these loans violate the Fair Debt Collections Practices Act, California's Rosenthal Debt Collection Practices Act, California's Consumer Legal Remedies Act, and California's Unfair Competition Law.  This Court has jurisdiction over the federal statutory claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the claims under California law.  Plaintiff hereby alleges the following:

## INTRODUCTION

1.      This case involves the unlawful attempt to collect on private loan debt that thousands of students were fraudulently induced to incur in order to attend Corinthian Colleges, Inc. ("Corinthian"), a now defunct for-profit chain of schools.  Corinthian deliberately and systematically took advantage of low-income and vulnerable Californians who had dreams of unlocking job opportunities and improving their lives through a college education.  Corinthian induced these students into enrolling in Corinthian's programs by making false promises to them about its job-placement rates, the earnings of its graduates, and the kinds of career-services assistance it would provide to graduates.  Although they gained little in return, the students paid a high price for their time at Corinthian because they were left saddled with large federal and private student loan debts that many struggle to pay off.

2.      To succeed as a business, Corinthian depended on a continuous influx of new students, most of whom needed federal government financial aid and private student loans to pay at least some of their tuition.  In order to maximize its profits, Corinthian intentionally recruited and enrolled vulnerable individuals who were isolated and suffered from low self-esteem; who were in dire financial straits; who

lacked sophistication in financial transactions such as loans; who had poor or no credit history; and who had few people in their lives able to advise or support them.  Single parents, formerly homeless youth, children of the working poor, young adults coming from troubled families, and even the homeless were among the groups specifically targeted by Corinthian.

3.     During recruitment, Corinthian preyed on these individuals by misrepresenting the benefits of its programs.  Among other deceptions, Corinthian consistently made false promises of job-related training and internship opportunities, distorted the job-placement rates of past students, and offered phony assurances of job-placement assistance.  It convinced students that their Corinthian education would allow them to work in careers where they would earn substantially more than they were able to earn before enrolling.  It also misled students about the true cost of its programs, the amount and nature of the loans for which Corinthian signed them up, and the likelihood that students would get jobs after graduation that would make it possible for them to repay those loans.

4.     Corinthian repeatedly and consistently set its prices high enough to ensure that the cost of student attendance always exceeded the maximum federal financial aid award available.  This meant that students who depended on financial aid to cover the entire cost of attending Corinthian—as many Corinthian students did—had to also take out private student loans to cover the gap between the cost of attendance and the maximum financial aid award.  When the 2008 recession motivated lenders to reduce their private student lending, Corinthian created its "Genesis Loan Program" to ensure continued receipt of both federal aid and private funds without changing its pricing scheme.  Through the Genesis Program, private lenders provided student loans to Corinthian students according to Corinthian's terms but without revealing to students the lenders' connections to Corinthian.  Frequently, Corinthian ultimately bought back the loans from the private lenders so that Corinthian became the holder of many of the Genesis loans.

5.      Federal and state government agencies ultimately uncovered Corinthian's phony promises and inflated job-placement rates and opened investigations into its practices, resulting in judgments against Corinthian for defrauding its students in several states.  Corinthian's fraud was so widespread that the federal Department of Education has approved the forgiveness of the federal loans made to former Corinthian students who attended hundreds of specified programs.

6.      The governmental investigations and disciplinary actions against Corinthian expanded in number and scope throughout 2014, ultimately resulting in Corinthian declaring bankruptcy on May 4, 2015.

7.      Before Corinthian filed for bankruptcy—but long after Corinthian's pervasive fraud was made public—Corinthian sold its Genesis student loans to third parties.  In August 2014, Defendant Turnstile bought over 505 million dollars of Genesis student loans from Corinthian for pennies on the dollar.  Turnstile then created Defendant Balboa to hold the student loan notes on Turnstile's behalf.

8.      At the time Turnstile bought these sham loans, 24 states' attorneys general and the federal Consumer Financial Protection Bureau ("CFPB") were investigating Corinthian for deceptive acts and practices when recruiting students, several states' attorneys general had already sued Corinthian for defrauding students, and the Department of Education had found that Corinthian misled its students and would no longer be allowed to receive federal money.

9.      In February 2015, Defendant Balboa entered into an agreement by which it promised to refrain from *suing or threatening to sue* on the Genesis loans it holds.

10.      Also in 2015, Balboa retained Defendant UAS to collect on the Genesis student loan debts held by Balboa.  Beginning in 2015 and continuing to the present, UAS has taken aggressive steps to collect on these loans, despite knowing that the former students only borrowed the money at all because of Corinthian's fraud and misrepresentations.  In addition, UAS has implicitly threatened to take collection

actions that are only possible through litigation even though such threats are barred by Balboa's agreement to not sue.

11.  Plaintiff now seeks, for herself and on behalf of Class Members, all available damages for UAS's unfair debt collection practices, cancellation of the Balboa-held Genesis student loans, and restitution of the monies paid to Defendants Balboa and Turnstile on these loans that were fraudulently obtained by Corinthian. Plaintiff further seeks the costs of litigation and attorneys' fees.

## JURISDICTION & VENUE

12.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises from violations of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692, *et seq.*, with supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

13.  Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the events at issue substantially occurred in San Bernardino and Riverside Counties, California.

14.  This Court has personal jurisdiction over Defendants because they have significant minimum contacts with California, or they otherwise availed themselves of the laws and markets of California through the purchasing, holding, and attempting to collect on debts owned by consumers in California. Defendants all transact business affairs in California and with California consumers, and a substantial part of the events giving rise to the claims occurred in California.

## PARTIES

15.  Plaintiff Deborah Terrell is a resident of Riverside County, California. She is a former student of Everest College, a d/b/a of Corinthian.

16.  Defendant UAS is a wholly owned subsidiary of NCO Group, Inc., a holding company for a number of debt-collection companies. The primary business of UAS is to collect student loan debts on behalf of UAS/NCO Group, Inc. customers

using mail and telephone communications.   UAS is a Wisconsin limited liability company.

17.   Defendant Turnstile is a Delaware limited liability company.   Its primary business is owning and collecting student loan debt.   It purchased the promissory notes of Plaintiff's and Class Members' private student loans from Corinthian.   Turnstile then created Balboa and transferred its ownership of the notes to Balboa.   Turnstile is the sole owner and controller of Balboa.   Turnstile's principal office is in California.

18.   Defendant Balboa is a Delaware statutory trust.   It is the current holder of the promissory notes for the student loans at issue in this action.   Balboa hired UAS to attempt to collect the student loan debts of Plaintiff and Class Members.

19.   Plaintiff and Class Members are ignorant of the true names and capacities of Defendants sued herein as Does 1 through 10, inclusive, and therefore sues these Defendants by such fictitious names.   Does 1 through 5 are debt-collection companies that collect student loan debts using mail and telephone communications, and who service loans currently owned by Balboa that originated with Corinthian.   Does 6 through 10 are current or previous holders of the promissory notes for the student loans at issue in this action and the creditors who either received payment on the promissory notes and/or on whose behalf Defendant UAS or Does 1 through 5 engaged in collection activity against Plaintiff and Class Members.

20.   Plaintiff is informed and believes, and thereon alleges, that Defendant Balboa was at all times an agent of, servant of, fiduciary of, or wholly controlled subsidiary in joint enterprise with Defendants Turnstile and Does 6 through 10.   At all times relevant, Defendant Balboa was acting within the course and scope of said agency, service, or enterprise.   Balboa has operated at all times relevant for the sole benefit of, and in complete unity of interests with, Defendants Turnstile and Does 6 through 10.   On information and belief, Defendant Turnstile ratified the conduct of Defendant Balboa alleged herein.

## FACTUAL ALLEGATIONS

**Corinthian's Business Model and Loan Program**

21.     Corinthian was once one of the largest chains of for-profit colleges in the United States and Canada.  It operated campuses across North America and online, through its wholly owned and directly controlled subsidiaries, under the Everest College, Everest College Phoenix Online, Everest Institute, Everest University Online, Heald College, and Wyotech labels.  Corinthian operated over 30 campuses in California alone.

22.     Due to their limited financial means, most Corinthian students had to pay at least some of their education expenses with financial aid.  Corinthian students were generally eligible for federal financial aid, also known as Title IV funds.

23.     Federal regulations mandate that for-profit schools such as Corinthian can only receive 90% of their revenue from Title IV funds.  The remaining 10% must come from another source, such as funds provided by the students or private student loans.  This is commonly referred to as the 90/10 rule.

24.     Because of the 90/10 rule, every dollar that students borrowed from private lenders to attend a Corinthian school unlocked nine dollars' worth of potential federal funding.  Private loan funds therefore represented an enormous source of revenue for Corinthian—not only because of their face value, but also because of the Title IV funding that Corinthian could then access from the federal government.

25.     In fact, Corinthian deliberately and artificially *raised* education prices to levels approximately 10-15% greater than the maximum amount of federal aid that students were eligible to receive.  Corinthian's actions forced low-income students to borrow all they could from the government *and* finance a portion of their education expenses in some other way.  This led to more tuition money for Corinthian, and a greater debt burden for its students.

26.     In 2008, Corinthian created its Genesis Loan Program to provide private student loans to enrolling students and continue satisfying the 10% private-funding

requirement for receiving federal funds.  Corinthian representatives assisted enrolling students in applying for financial aid and automatically signed up students for Genesis loans as part of that assistance.

27.   The Genesis loans were originated by lenders who had a connection to Corinthian and who specialized in extending credit to subprime borrowers.  The Genesis lenders lent money to students according to Corinthian's terms, and Corinthian handled all loan-related negotiations and person-to-person interactions with the borrowers.

28.   After the private lender originated the Genesis loans, the loans would be sold either to Corinthian or to a third-party investor.  When the loans were sold to an investor, Corinthian was obligated to buy back the promissory notes for the loans if borrowers became 90 or more days late in making their payments.  This scheme meant that, although Corinthian could not make Genesis loans directly to its students, it often became the creditor on the loans.

29.   In order to induce students to enroll at Corinthian and to borrow through Corinthian's Genesis Loan Program, Corinthian grossly misrepresented the benefits of its programs.  Among other deceptions, Corinthian systematically made false promises of job-related training and internship opportunities, distorted the job-placement rates of past students, and offered phony assurances of job-placement assistance. It convinced students that Corinthian's programs would allow students to work in careers where they would earn substantially more than they were able to earn prior to enrolling.  It also misled students about the true cost of their programs, the amount and nature of the loans that Corinthian signed them up for, and about the likelihood that students would be able to get jobs after graduation that would allow them to repay those loans.

**The Federal & State Investigations That Led to Corinthian's Closure Were Made Public and Put Defendants on Notice of Corinthian's Fraud.**

30.   By the time Turnstile and Balboa acquired the loans at issue in this case in August 2014, Corinthian had been under investigation for years by multiple

governmental agencies in regards to Corinthian's fraudulent inducement of students to enroll and to take on private student loans through Corinthian's Genesis Loan Program. The existence and substance of these investigations had been made public through Corinthian's publicly available filings with the Securities and Exchange Commission ("SEC"), announcements by the investigating agencies, and various judicial and administrative complaints filed against Corinthian.

31.    Between October 2010 and March 2014, 24 states' attorneys general scrutinized Corinthian's business practices related to enrollment and student loans. At the federal level, the CFPB began investigating Corinthian in or about April 2012, when it served Corinthian with a Civil Investigative Demand to determine whether Corinthian was engaging in unlawful acts or practices relating to the advertising, marketing, or origination of private student loans.

32.    In October 2013, the Attorney General of California filed a complaint against Corinthian and its various subsidiaries. The complaint alleged that Corinthian:

a.    made untrue or misleading representations relating to job placement;

b.    advertised for programs and courses that Corinthian did not offer and then induced students who came for those programs to attend different programs;

c.    engaged in unlawful debt collection practices related to the private student loans (those practices included pulling students out of class if they were late on loan payments); and

d.    failed to disclose Corinthian's role in the private student loan program.

33.    In January 2014, Corinthian reported in a public SEC filing that the CFPB had provided official notification of a possible enforcement action against Corinthian for violations of the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5536.

34.     Similarly, in January 2014, the Iowa Attorney General's office notified Corinthian that it was leading an investigation of Corinthian on behalf of its citizenry and residents of 12 other states related to practices including, among other things, Corinthian's job-placement statistics, the enrollment qualifications of its students, licensing rates for its graduates, and the origination of student loans.  Over the next few months, three more states joined the investigation.

35.     Also in January 2014, the federal Department of Education ("Department") informed Corinthian that any new locations or programs would have to be approved by the Department in advance.

36.     In April 2014, after three years of investigation, the Attorney General of Massachusetts filed suit against Corinthian.  That suit alleged unfair and deceptive business practices including the misrepresentation of how many graduates found employment in their field of study, and how much graduates earned.  According to the complaint, students "*received no benefit from their loans*."  Complaint, <u>Commonwealth of Massachusetts v. CCI Colleges, Inc.</u>, No. 14-cv-01093 at ¶ 6 (emphasis added).

37.     On June 12, 2014, the Department restricted Corinthian's ability to receive and spend Title IV funds.  When it became clear that Corinthian could not continue operations without immediate access to federal funds, it entered into an agreement with the Department whereby Corinthian was allowed to obtain limited Title IV funds in exchange for agreeing to sell or close a majority of its campuses under oversight of an independent monitor.

38.     On August 22, 2014, the Department informed Corinthian that one of its schools, Everest Institute, would no longer be eligible to receive federal Title IV funding because Everest Institute communicated *false job-placement data* to its accreditors and to its current and prospective students.  A true and correct copy of the Department's enforcement letter is attached hereto as Exhibit A.

39.     According to the Department's enforcement letter, to inflate its post-graduation job-placement rates, Corinthian paid employers $2,000 for each Everest Institute graduate that they promised to employ for at least 30 days, and "knowingly counted" placements that were for less than 30 days as "sustainable" employment. Corinthian also counted as "employed" Everest Institute students who were merely interviewed, employed for less than a day, or briefly employed but unpaid for their work.  Exhibit A, p. 8-10.

40.     In late August 2014, Corinthian received a Civil Investigative Demand from the United States Department of Justice for potential False Claims Act violations related to Corinthian's misrepresentations regarding, among other things, graduate job-placement rates and Corinthian's private student loan program.

41.     On September 3, 2014, Corinthian received a grand jury subpoena from the United States Attorney's Office in the Middle District of Florida.

42.     On September 10, 2014, Corinthian received a grand jury subpoena from the United States Attorney's Office in the Northern District of Georgia.

43.     On September 16, 2014, the CFPB filed suit against Corinthian in the Northern District of Illinois. Complaint for Permanent Injunction and Other Relief, Consumer Financial Protection Bureau v. CCI Colleges, Inc., No. 14-7194 (N.D. Ill. Sept. 16, 2014).  The CFPB's complaint quoted Corinthian employees and officials who described their students as:

　　　　a.　　"individuals who have 'low self-esteem' and '[f]ew people in their lives who care about them'; who are 'isolated,' 'stuck, unable to see and plan well for future;'" and

　　　　b.　　"having '[m]inimal to non-existent understanding of basic financial concepts,' as well as poor or no credit history."

**Balboa's Acquisition of the Corinthian Loans**

44.     By mid-2014, as a result of the mounting investigations and in particular because of the Department's restrictions limiting Corinthian's ability to open new

campuses or receive federal financial aid dollars, Corinthian was on the brink of financial collapse.

45.     On August 19, 2014, Corinthian's creditors gave it permission to sell off assets to obtain 20 million dollars to cover Corinthian's operational expenses and use the proceeds to keep school doors open.

46.     On or about August 20, 2014, Corinthian sold student loan promissory notes (the "Loan Pool") with a face value of 505 million dollars to Turnstile in exchange for 19 million dollars (or less than $.04 per dollar of debt).  According to the complaint in the CFPB case, the Loan Pool represented "virtually all" of the private student loans Corinthian owned.

47.     The sale of the Loan Pool to Turnstile took place *after* Corinthian had agreed to wind down operations in most of its campuses, and *after* 24 states' attorneys general and the CFPB had launched investigations in Corinthian's fraudulent conduct. The existence of all of the state and federal investigations and allegations described herein were public knowledge at the time of the sale.  Nearly all of that information was contained in Corinthian's 2014 SEC filings.  The remainder could be found in press releases and public court filings.

48.     Balboa came into existence and was registered with the state of Delaware on October 10, 2014.  Turnstile subsequently transferred ownership of the Loan Pool to Balboa.

**ECMC's Payment to Balboa**

49.     On February 2, 2015, ECMC Group, Inc. and Zenith Education Group (collectively "ECMC") entered into an agreement with Corinthian by which ECMC acquired most of Corinthian's remaining assets and operations as part of Corinthian's winding down of operations.

50.     On the date that ECMC acquired Corinthian's assets, it entered into an agreement with the CFPB.  The agreement limited ECMC's liability in the CFPB case

against Corinthian.  A true and correct copy of the letter confirming the agreement is attached hereto as Exhibit B.  That agreement states that ECMC would:

    a.   Reduce the loan principal of affected students by 40%, equaling total debt relief of 480 million dollars;

    b.   Remove all previous negative credit reporting about these loans;

    c.   Refrain from suing or threatening legal action against borrowers when seeking payment on any remaining balances; and

    d.   Make arrangements with third-party holders of those loans previously sold by Corinthian to follow these same guidelines.

51.   As Balboa was a third-party holder of Corinthian student loans, ECMC was required to ensure that Balboa followed the requirements of the agreement with the CFPB.

52.   In exchange for Balboa's cooperation, ECMC paid Balboa 7.5 million dollars.  Plaintiff is informed and believes, and thereon alleges, that this payment was compensation for Balboa performing the required debt reduction and in exchange for Balboa's agreement to abide by the terms of the contract between ECMC and CFPB, including the prohibition against taking legal action to enforce the remaining private student loan balances.  The 7.5 million dollar payment equals just under 40% of what Turnstile paid Corinthian for the loan pool (19 million dollars). *See* Exhibit B, section (1).

**Findings of Fraud, Unlawful Debt Collection, and Unfair Business Practices against Corinthian after sale of the Loan Pool**

The Department of Education's Findings re: Corinthian's Heald Colleges

53.   On April 14, 2015, after a year-long investigation, the Department of Education informed Corinthian that it intended to fine Corinthian 30 million dollars for the actions of Corinthian at its Heald Colleges.  According to the Department, Corinthian had "misrepresent[ed] its [job] placement rates to current and prospective

students."  A true and correct copy of the Department's enforcement letter is attached hereto as Exhibit C.

54.    For example, Corinthian had deemed that up to 58% of graduates from one of its Heald Colleges programs had "deferred employment," such that they were not currently "employable."   Excluding all of these unemployed (voluntarily or otherwise) students from its job-placement calculations created misleading job-placement rates of up to 100%. Exhibit C, p. 5-6.

55.    In addition, the Department found that "Heald [Colleges] failed to disclose that it counted as placed graduates those former students who had obtained their jobs prior to graduation from the school, and in some cases, graduates who had obtained their jobs prior to the date they commenced their studies at Heald." Exhibit C, p. 7.  This practice accounted for up to a third of Corinthian's alleged "placements" of Heald Colleges graduates. Id.

56.    Corinthian also paid employers to hire Heald Colleges graduates for as little as two days of work, then counted those students as having found employment in their fields. Exhibit C, p. 7-8.

57.    Corinthian reported that Heald Colleges students had found employment in their fields of study, when they had not.  For example, Corinthian counted a student as "placed in-field" when she worked in food service at Taco Bell after obtaining an accounting degree. Exhibit C, p. 8-9.

58.    With respect to its medical assistant program at one Heald Colleges campus, Corinthian misrepresented its job-placement rate as 78% instead of the actual 33% placement rate. Exhibit C, p. 9-10.

The CFPB Case

59.    On October 27, 2015, the District Court for the Northern District of Illinois entered default judgment in the CFPB case against Corinthian.  A copy of that judgment is attached hereto as Exhibit D ("Default Judg.").   The court found that

Corinthian fraudulently induced students to take out the Genesis loans, and then engaged in unlawful and unfair collection of those loans.

60.    Specifically, "[f]rom at least July 2011 to July 2014, Corinthian induced students to take out [private] loans through a series of misrepresentations about the likely employment outcomes for Corinthian students." Default Judg. ¶ 18. "Corinthian made these misrepresentations to borrowers and prospective borrowers of [private] loans in order to induce them to take out the loans." Default Judg. ¶ 21.

61.    Corinthian misrepresented outcomes by, *inter alia*: (1) calculating job-placement rates by including employment that had lasted for only one day; (2) "fudging" or "simply misreporting" job-placement statistics; (3) undercounting how many of its graduates were "employable," thereby increasing the overall percentage of employed graduates in the pool of "employable" graduates; and (4) paying employers to hire its graduates temporarily. Default Judg. ¶ 19.

62.    With respect to unlawful and unfair debt collection, Corinthian harassed students who fell behind on loan payments. Default Judg. ¶ 29. This harassment included: (1) "prevent[ing] enrolled students from attending class;" (2) "pull[ing] students out of class in front of their classmates;" and (3) "den[ying] students access to computers and other educational materials." *Id.*

The Department of Education's Most Recent Findings

63.    In conjunction with the Attorneys General of California, Massachusetts, and other states, the Department broadened its investigation into Corinthian's practice of using falsified job-placement rates to recruit students.  In November 2015, the Department issued explicit findings that various programs at Corinthian campuses in California had falsified the job-placement rates it showed to prospective students in specific years.  Subsequently, the Department announced new findings that falsified job-placement rates were shown to prospective students at other Corinthian schools around the country, bringing the total number of Corinthian campuses covered by the findings to 91.

**Corinthian Closes its Doors**

64.     On April 26, 2015, Corinthian announced that it was closing its last remaining campuses effective April 27, 2015.  At the time of the closing, Corinthian still operated approximately 28 campuses hosting over 10,000 students.

65.     On May 4, 2015, Corinthian filed for bankruptcy.

## FACTS REGARDING NAMED PLAINTIFF

66.     Plaintiff Deborah Terrell is a 55-year-old mother of two.  Up until late 2013, Plaintiff worked for a home restoration company called "Start to Finish."  She had to undergo knee surgery in September 2013, and stopped working during her recovery.

67.     On June 10, 2014, while still unemployed, Plaintiff drove her 19-year-old daughter to an Everest campus so that her daughter could enroll in a program there. While she was there, a recruiter spoke to Plaintiff and tried to convince her to enroll herself as well.  The recruiter asked Plaintiff a few questions about her situation and recommended that she enroll at a Corinthian school.  Prior to the visit, Plaintiff had no desire or intention to enroll at Everest.

68.     Corinthian's recruiter told Plaintiff that a Medical Administrative Assistant diploma from one of Corinthian's Everest College campuses would enable Plaintiff to get a better job with a higher salary than she would be able to get otherwise.  The Corinthian recruiter also claimed that the school's career services office would help her get a job after graduation, and would provide job-search support such as interview preparation and job listings forwarded from local employers with whom Corinthian supposedly had relationships.  The recruiter told Plaintiff that the school had a 90% success rate in placing graduates in jobs within their fields of study.

69.     The Corinthian recruiter also told Plaintiff that Plaintiff would earn good money as a medical administrative assistant in her first year after graduating, and that she would earn even more after obtaining a further certification.

70.    Corinthian's recruiter then told Plaintiff that she would need to enroll immediately in order to secure a slot in the program and pressured her to sign up the same day.   Based on the recruiter's representations about the post-graduation job opportunities and earnings and the need to act quickly, Plaintiff enrolled that day, June 10, 2014, in the medical administrative assistant program at Everest College.

71.    At the time she enrolled, Plaintiff did not have a clear understanding of how much debt she would ultimately owe, or of the differences between her federal student loans and her private ones.  She believed, based on the representations made to her by the Corinthian recruiter that she would soon become a medical administrative assistant and her income would increase sufficiently to allow her to pay off all her loans.

72.    The total cost of tuition for Plaintiff's nine month program was over $19,000.  Corinthian arranged for Plaintiff to obtain a state grant of around $5,000, around $9,000 in federal student loans, and a private loan with an original principal balance of $4,947.09.  The original interest rate for the private loan was 8.9%.

73.    Plaintiff took her program extremely seriously and strove to succeed in every way she could.  She got straight A's in all her classes.  She received various awards for achievements including perfect attendance and honor roll recognition.  She also took advantage of multiple opportunities to complete additional trainings and certifications, including training in medical billing practices and compliance with health industry regulations.   She was even chosen to serve as her school's "Ambassador" in a program that involved peer mentoring, tutoring, and hosting school events and fundraisers, including for Ronald McDonald House.

74.    At Corinthian's direction, Plaintiff paid an estimated $2,600 for supposedly required schoolbooks when she began her program.  She ultimately did not use many of these books, and never even opened some of them.

75.    When Plaintiff was recruited to enroll, Corinthian promised it would place her in an externship that would provide skills relevant to her desired medical

administrative assistant career, as well as contacts with potential employers.  Plaintiff was also assured that most students were able to secure permanent employment positions with their externship host.  However, the externship that Corinthian placed her with involved only mass billing work that was entirely unrelated to her area of study, and did not require her to utilize any of the skills that she was supposed to learn as part of her medical administrative assistant program.  When Plaintiff complained that her externship was not what Corinthian had promised and requested a transfer to a more career-relevant position, Corinthian refused.

76.    Plaintiff completed the final requirements of her program in March of 2015.  In April of 2015, Corinthian shut down all its remaining California campuses, including the Everest campus that Plaintiff attended.  Students did not receive any notice whatsoever of the impending closure.  Plaintiff's scheduled graduation ceremony was canceled.  At first, she was unable to obtain copies of her transcript or diploma.  When she initially requested her diploma, a Corinthian representative told her that the diploma was "worthless" because the school had "lost its accreditation." Although she subsequently was able to obtain her diploma, she still has been unable to obtain a copy of her transcript.

77.    Contrary to the recruiter's promises, Plaintiff received no career services or job-search assistance from Corinthian.  Without any help from Corinthian and despite searching diligently for work and applying for every position she could find, Plaintiff has been unable to obtain a job as a medical administrative assistant.  Plaintiff makes less now than she was making *before* she attended Corinthian and substantially less than what Corinthian told her she would make, and there are no opportunities for advancement in her current position.

78.    Plaintiff's private student loan was among those covered by the CFPB's agreement with ECMC.  Pursuant to the CFPB's requirements and as a result of ECMC's payment of 7.5 million dollars to Turnstile/Balboa, Plaintiff's balance due

was reduced by 40%.  In addition, Balboa was prohibited from taking or threatening legal action against Plaintiff to collect the balance owed on the loans.

79.   Defendant UAS began servicing Plaintiff's student loan on behalf of Defendant Balboa on June 1, 2015, and sent Plaintiff a number of collection letters over the next several months.   UAS's collection letters to Plaintiff include the following statements:

> a.   On July 30, 2015: "Your agreement with BALBOA STUDENT LOAN TRUST requires prompt payment.  Please pay the total amount due or tell us why payment should not be due at this time."
>
> b.   On September 18, 2015: "WARNING … You have defaulted on your obligation to pay this loan … Payment of the total amount due on this debt is required immediately."
>
> c.   On October 3, 2015: "WARNING OF DEFAULT …Your seriously delinquent account requires immediate attention.  If you do not respond to this notice, you will have defaulted on your obligation to repay this debt.  Send payment of the total amount now due or contact us immediately."
>
> d.   On November 17, 2015: "NOTICE … Your severely past due account requires immediate attention … Failure to resolve this delinquency may require us to place your account with a collection agency.  You may be required to pay the full balance of your loan plus the costs of collection."

80.   Almost immediately after being hired by Balboa, UAS began a pattern of persistent telephone harassment of Plaintiff.  By August 2015, Plaintiff was receiving up to five calls a day from UAS.  She often received two to four calls from UAS each day, several days every week.  At times the calls were be back-to-back.  Other times, the calls would be every thirty minutes.  Some days the calls began in the morning then lapsed for the afternoon, only to begin again in the early evening.

81.     In October 2015, a UAS representative told Plaintiff during one of these phone calls that UAS could "come after [her] house" because of her student loan debt. The same UAS representative also threatened to "come after" Plaintiff's bank account and wages to collect on the debt.

82.     A few weeks later, in approximately early November 2015, another UAS representative told Plaintiff by phone that UAS could and would "go after" her house.

## CLASS ACTION ALLEGATIONS

83.     Plaintiff brings this action on her own behalf and on behalf of all other persons similarly situated pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

84.     Plaintiff requests certification of two distinct classes.   The Classes are defined as follows:

> CLASS NO. 1 [The Debt Collection Class]: All persons who attended a Corinthian Colleges, Inc. college in California within the last four (4) years, who took out private loans to fund his or her Corinthian education, whose private loans were subsequently assigned to Defendant Balboa, whose loans are currently serviced by Defendant UAS, and to whom UAS has sent one or more debt collection notices.

> CLASS NO. 2 [The Balboa Debt Discharge Class]: All persons who attended a Corinthian Colleges, Inc. college in California within the last four (4) years, who took out private loans to fund his or her Corinthian education, and whose private loans were subsequently assigned to Defendant Turnstile and then to Defendant Balboa.

85.     The members of the Classes are so numerous that joinder of all members is impracticable.  Although the exact number of members of each Class is known only to Defendants at this time, the number and identity of Class Members can be easily determined from Defendants' records.  Plaintiff is informed and believes, and thereon alleges, that well over 1,000 Corinthian students who attended school in California in the last four years have taken out loans that are currently held by Balboa.  The Balboa

Debt Discharge Class is thus believed to include more than 1,000 members. Plaintiff is also informed and believes, and thereon alleges, that UAS is servicing a large subset of the Balboa loans. The Debt Collect Class is thus believed to include at least several hundred members.

86. There are questions of law and fact common to each Class.

87. For the Debt Collection Class, the common questions include but are not limited to:

        a.    Whether UAS sought collection of student loan debts that it was on notice were obtained by Corinthian through fraud;

        b.    Whether UAS continued to report the student loans as delinquent on class members' credit reports, despite knowing that the debt was obtained by Corinthian's fraud;

        c.    Whether UAS's actions were willful, knowing, and with notice of Corinthian's wrongdoing;

        d.    Whether UAS's actions violated the Fair Debt Collection Practices Act;

        e.    Whether UAS's actions violated the Rosenthal Fair Debt Collection Practices Act; and

        f.    Whether Defendants' actions violated the California Business and Professions Code section 17200, *et seq*.

88. For the Balboa Debt Discharge Class, the common questions include but are not limited to:

        a.    Whether Corinthian fraudulently induced Class Members into borrowing the loans currently held by Balboa and Turnstile;

        b.    Whether Corinthian misrepresented to Class Members the nature of the education and job-placement services it would provide in violation of the Consumer Legal Remedies Act;

c.    Whether Turnstile and Balboa are liable for Corinthian's violations of the law because of the contract term subjecting holders of the debts to claims assertable against Corinthian;

d.    Whether Turnstile and Balboa were on notice of Corinthian's wrongdoing when they acquired Class Members' loans, barring them from claiming "holder in due course" immunity to Plaintiff's and Class Members' claims;

e.    Whether Class Members' loans held by Balboa are voidable as the result of Corinthian's fraud;

f.    Whether Class Members are entitled to forgiveness or discharge of their loans held by Balboa due to Corinthian's violations of the Consumer Legal Remedies Act;

g.    Whether Class Members are entitled to restitution of amounts already paid on their Balboa-held student loans as the result of Corinthian's illegal practices; and

h.    Whether Defendants' actions violated the California Business and Professions Code section 17200, *et seq.*

89.    These common questions of fact and law predominate over questions that affect only individual class members.  Proof of a common set of facts will establish the right of each Class Member to recover, and there are ascertainable classes of individuals entitled to relief.

90.    Prosecution of separate actions by individual members of the Classes would create a risk that inconsistent or varying adjudications with respect to individual members of the Classes would establish incompatible standards of conduct for the parties opposing the Classes.

91.    Plaintiff's claims are typical of those of absent Class Members of each Class.

92.    Plaintiff can and will fairly and adequately represent and protect the interests of the proposed Classes.  Plaintiff has no interest that conflicts with, or is antagonistic to, the interests of the proposed Classes.

93.    Plaintiff has employed attorneys who are experienced and competent in consumer and civil rights litigation and class actions, and are able to adequately and vigorously pursue this class action on behalf of all Class Members and to provide notice to Class Members.

94.    Plaintiff is informed and believes, and thereon alleges, that Defendants have acted on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or declaratory relief with respect to the Classes as a whole.

95.    A class action under Rule 23(b)(3) is superior to other available methods for the fair and efficient adjudication of the claims asserted herein given that:

a.    The common issues of law and fact, as well as the relatively small size of the individual Class Members' claims, substantially diminish the interest of members of the Classes in individually controlling the prosecution of separate actions;

b.    Many Class Members are unaware of their rights to prosecute these claims and lack the means or resources to secure legal assistance;

c.    No unusual difficulties are likely to be encountered in the management of these Classes in that questions of law or fact to be litigated at the liability stage are common to the Classes, as are injunctive, declaratory, and restitutionary relief issues;

d.    A class action will avoid the heavy burden of multiple, duplicative lawsuits and will allow the Court to adjudicate the claims of all class members at once and enter an appropriate order regarding monetary relief with respect to the Class as a whole; and

e. There has been no litigation already commenced against Defendants by the members of the Classes to determine the questions presented.

96. Pursuant to Rule 23(c)(2)(B), Plaintiff requests that notice be sent to the Debt Collection Class of all claims in the First, Second and Fourth Causes of Action, and to the Balboa Debt Discharge Class of all claims in the Third, Fourth, and Fifth Causes of Action in a form to be determined by the parties and the Court upon class certification.

## FIRST CAUSE OF ACTION
### CLASS VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT, 15 U.S.C. §§ 1692, *et seq.*
(Brought on behalf of members of the Debt Collection Class against Defendants UAS and Does 1 through 5, inclusive)

97. Plaintiff incorporates by reference the preceding paragraphs as if fully alleged herein.

98. The Fair Debt Collection Practices Act ("FDCPA") was enacted in 1968 to counter abusive debt collection practices, prevent abusive debt collectors from having an unfair advantage over responsible debt collectors, and to make consumer protections with regard to debt collection more consistent. 16 U.S.C. § 1692(e). These protections apply regardless of whether the consumer actually owes the underlying debt.

99. Class Members are natural persons who Defendants allege are obligated to pay student loan debt arising out of their enrollment in a Corinthian program in California.

100. Class Members' student loans were used to pay for their personal education, which they sought for the personal and household purpose of improving their ability to obtain better paying and more fulfilling jobs.

101. Defendants are "debt collectors" within the meaning of 15 U.S.C. § 1692a(6) as a consequence of the facts alleged above.

102. Defendants, through their behavior described herein, violated the restrictions of 15 U.S.C. § 1692e, which prohibits false, deceptive, or misleading representations. False, deceptive, or misleading representations include any threats to take any action that cannot legally be taken or are not intended to be taken. Defendants violated this restriction through their behavior described herein, including but not limited to sending collection notices that imply that UAS will take legal action to collect on the debts if they remain unpaid. Such legal action is prohibited by the terms of the ECMC agreement.

103. Defendants, through their behavior described herein, also violated the restrictions of 15 U.S.C. § 1692f, which prohibits unfair or unconscionable means to collect on a debt. Unfair or unconscionable means include the collection of any amount not authorized by the contract and by law. Defendants violated this restriction through their behavior described herein, including but not limited to:

      a.    attempting to collect debts that are uncollectable as the result of Corinthian's fraud and failure to deliver the promised job training and job-placement services, of which Defendants were on notice; and

      b.    continuing to report the student loans as delinquent on Class Members' credit reports, despite knowing that the debt was obtained by Corinthian's fraud.

104. Defendants' behavior described herein has damaged Plaintiff and Class Members by negatively affecting their credit without cause, causing them anxiety resulting from the threats of legal action, and requiring them to take time away from work to address the collection attempts. The amount of the damages will be proven at trial.

105. Defendants' actions described herein were willful, knowing, and with notice of Corinthian's wrongdoing.

106.   Plaintiff and Class Members are entitled to statutory damages, costs, and attorney's fees, in addition to actual damages.

Whereas Plaintiff and Class Members pray for relief as follows:

1.   For an award of actual damages to Plaintiff and Class Members to be proven at trial;

2.   For an award of statutory damages to Plaintiff and Class Members;

3.   For an award of costs of suit and attorney's fees as allowed by 15 U.S.C. § 1692k(a)(3); and

4.   For such other relief as this Court deems proper.

## SECOND CAUSE OF ACTION
### CLASS VIOLATIONS OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT, California Civil Code § 1788, et seq.
(Brought on behalf of members of the Debt Collection Class against Defendants UAS and Does 1 through 5, inclusive)

107.   Plaintiff incorporates by reference the preceding paragraphs as if fully alleged herein.

108.   The Rosenthal Fair Debt Collection Practices Act, California Civil Code § 1788 *et seq.* ("Rosenthal Act") was enacted in 1976 to protect consumers from the oppressive and over-reaching debt collection practices of creditors and professional debt collectors.   Civil Code § 1788.1(b).[1]   The Legislature found that "unfair or deceptive debt collection practices undermine the public confidence which is essential to the continued functioning of the banking and credit system and sound extensions of credit to consumers."   Civil Code § 1788.1(a)(2).   The Rosenthal Act as originally passed set forth a list of proscribed collection practices.   Then, in 1999, the California Legislature expanded creditor liability even further, by incorporating violations of the FDCPA as violations of the Rosenthal Act.   Civil Code § 1788.17.

---

[1] All references to the "Civil Code" herein are to the California Civil Code unless otherwise stated.

109.   The student loans at issue herein are each a "consumer debt" as defined by Civil Code § 1788.2(f) because Plaintiff and Class Members are natural persons and they obtained the student loans to pay for services obtained for personal and household purposes, as described above.

110.   Defendants at all times relevant herein were "debt collectors" within the meaning of Civil Code § 1788.2(c), as a consequence of the facts alleged above.

111.   Defendants' actions described herein that were in violation of the FDCPA are also violations of Civil Code § 1788.17.

112.   Defendants' behavior described herein has damaged Plaintiff and Class Members by negatively affecting their credit without cause, causing them anxiety over the threats of legal action, and requiring them to take time away from work to address the collection attempts.  The amount of the damages will be proven at trial.

113.   Defendants' violations of the Rosenthal Act were willful and knowing, thereby entitling plaintiff to statutory damages pursuant to Civil Code § 1788.30(b).

114.   Plaintiff and Class Members are entitled to statutory damages, costs, and attorney's fees, in addition to actual damages.

Whereas Plaintiff and Class Members pray for relief as follows:

1.     For an award of actual damages to Plaintiff and Class Members to be proven at trial;

2.     For an award of statutory damages to Plaintiff and Class Members;

3.     For an award of costs of suit and attorney's fees as allowed by Civil Code § 1788.30(c) and 15 U.S.C. § 1692k(a)(3); and

4.     For such other relief as this Court deems proper.

**THIRD CAUSE OF ACTION**
**CLASS VIOLATIONS OF THE CONSUMERS LEGAL REMEDIES ACT,**
**California Civil Code § 1750, et seq.**
(Brought on behalf of members of the Balboa Debt Discharge Class against
Defendants Turnstile, Balboa, and Does 6 through 10, inclusive)

115. Plaintiff incorporates by reference the preceding paragraphs as if fully alleged herein.

116. Plaintiff is informed and believes, and thereon alleges, that Plaintiff's and Class Members' student loan contracts include a term substantially equivalent to the following:

> ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

117. Pursuant to such contract language, Defendants are subject to liability for all claims that Plaintiff and Class Members could assert against Corinthian.

118. Even if the above-mentioned contract terms were not included in the contracts, Defendants Turnstile and Balboa were on notice of Corinthian's wrongdoing when they each acquired Plaintiff's and Class Members' loans, barring them from claiming "holder in due course" immunity to Plaintiff's and Class Members' claims.

119. The Consumer Legal Remedies Act is a California consumer protection statute that prohibits unfair or deceptive acts or practices in the advertising, marketing, and representation of goods or services offered. Specifically, the Act prohibits a vendor from representing that the services it offers are of a particular quality or grade when they are not, from advertising services it does not intend to provide, and from representing that the services it offers have characteristics, uses, or benefits that they do not have.

120.  Plaintiff and Class Members are each a "consumer" as defined by Civil Code § 1761(d) because the student loans at issue were used by them to pay for their personal educations, which they sought for the personal and household purpose of improving their ability to obtain a better paying and more fulfilling jobs.

121.  Corinthian, a limited liability company, was a "person" as defined by Civil Code § 1761(c), as that definition includes both individuals, limited liability companies, and "other group[s], however organized."

122.  The student loans at issue herein were each a "transaction" as defined by Civil Code § 1761(e) because they were agreements between a consumer and a person for the performance of education and job-placement services.

123.  Corinthian violated Civil Code § 1770 through the behavior described above, including but not limited to:

    a.  representing to Plaintiff and Class Members that Corinthian had higher rates of historical success placing its graduates in careers in their field than it actually had;

    b.  representing to Plaintiff and Class Members that Corinthian would provide meaningful assistance in placing them with jobs, when in fact it did not;

    c.  representing to Plaintiff and Class Members that students could expect salaries and wages after graduating that they did not have realistic chances of earning;

    d.  representing to Plaintiff and Class Members that their educations with Corinthian would have characteristics, such as relevant externship placement, that their educations did not have, as described above; and

    e.  representing to Plaintiff and Class Members that obtaining their educations with Corinthian had benefits, such as employer contacts

and prospective employers' respect for a Corinthian education, that their educations did not have, as described above.

124.   As described above, government investigations have repeatedly found that Corinthian's misrepresentations, which were made in violation of Civil Code § 1770, were intended to induce students like Plaintiff and Class Members to enroll with Corinthian and enter into the related student loan contracts.

125.   As the result of Corinthian's actions, Plaintiff and Class Members have been damaged by the negative effects on their credit without cause, the anxiety resulting from not being able to obtain the types of jobs and employment incomes they were promised, and the anxiety resulting from struggling to repay their loans without the employment opportunities and incomes they were promised by Corinthian.

Whereas Plaintiff and Class Members pray for relief as follows:

1.   For an order declaring that the promissory notes evidencing the student loan obligations at issue are void and of no legal effect;

2.   For an order instructing Defendants to restore to Plaintiff and Class Members all sums paid on the disputed student loans;

3.   For an order instructing Defendants to remove all negative credit information regarding Plaintiff and Class Members that was furnished to consumer reporting agencies and is related to the voided student loans;

4.   For an injunction barring all future attempts to collect on or otherwise enforce the student loan obligations at issue; and

5.   For such other relief as this Court deems proper.

### FOURTH CAUSE OF ACTION
### CLASS VIOLATIONS OF CALIFORNIA BUS. & PROF. CODE § 17200, et. seq.
(Brought on behalf of members of both Classes against All Defendants)

126.   Plaintiff incorporates by reference the preceding paragraphs as if fully alleged herein.

127.   California Business and Professions Code § 17200 *et seq.* is known as the Unfair Competition Law.  It prohibits businesses from using any unlawful, unfair, or fraudulent act or practice in the conduct of its business.

128.   Defendants' business acts and practices within the last four years, as described above, violated multiple federal and state laws, including but not limited to the Fair Debt Collection Practices Act and the Rosenthal Fair Debt Collection Practices Act.

129.   Corinthian's business acts and practices within the last four years, as described above, violated multiple federal and state laws, including but not limited to the Consumer Legal Remedies Act, California contract law, and Department of Education requirements for receiving federal financial aid.  Defendants, who seek to reap the benefits of Corinthian's unlawful actions, are also liable for Corinthian's unlawful business practices to the degree allowed by the contract and equitable principles, as described above.

130.   Defendants' business acts and practices within the last four years, as described above, offend public policy and are substantially injurious to consumers, in that Defendants seek to collect a debt known to have been procured by fraud and have relied upon unfair means to collect that debt.

131.   Corinthian's business acts and practices within the last four years, as described above, offend public policy and are substantially injurious to consumers, in that Corinthian procured the loans at issue herein through fraud and used unfair means to collect those debts.  Defendants, who seek to reap the benefits of Corinthian's actions, are liable for Corinthian's unfair business practices to the degree allowed by the contract and equitable principles, as described above.

132.   Defendants' unfair and unlawful conduct, as described above, is typical of how Defendants regularly interact with consumers like Plaintiff and Class Members. As a result, Defendants' business acts and practices injure or threaten to injure in the

future other consumers who—like Plaintiff and Class Members—Corinthian defrauded.

133.   Corinthian's business acts and practices within the last four years, as described above, included deliberate misrepresentations intended to mislead consumers into enrolling at Corinthian colleges, as described above.  Defendants, who seek to reap the benefits of Corinthian's actions, are liable for Corinthian's fraudulent business practices to the degree allowed by the contract and equitable principles, as described above

134.   Defendants' business acts and practices, as described above, are likely to deceive affected consumers as to their legal rights and obligations, and by use of such deception, may preclude affected consumers from exercising legal rights to which they are entitled.

135.   Defendants' acts and practices described herein have damaged Plaintiff and Class Members by negatively affecting their credit without cause, causing them anxiety over unauthorized legal action, and requiring them to take time away from work to address the collection attempts.

136.   Pursuant to Business & Professions Code § 17203, Plaintiff and Class Members seek an order enjoining Defendants from engaging in the acts and practices as hereinabove alleged, and ordering that Defendants disgorge all ill-gotten gains and provide appropriate restitution to all affected consumers.

137.   Plaintiff and Class Members seek recovery of attorneys' fees incurred in the filing and prosecution of this action pursuant to Code of Civil Procedure § 1021.5 and any other applicable law.

Whereas Plaintiff and Class Members pray for relief as follows:

1.      For an order instructing Defendants to restore to Plaintiff and Class Members all sums paid on the student loans at issue;

2.      For an injunction barring all future attempts to collect on or otherwise enforce the student loan obligations at issue;

3.    For an injunction barring Defendants from collecting on Plaintiff's and Class Members' student loans and any similar loans known to have been procured through the fraud of Corinthian;

4.    For an order instructing Defendants to remove all negative credit information furnished to consumer reporting agencies related to Plaintiff's and Class Members' student loans known to have been procured through the fraud of Corinthian;

5.    For an award of attorney's fees as allowed by Code of Civil Procedure § 1021.5; and

6.    For such other relief as this Court deems proper.

### FIFTH CAUSE OF ACTION
### CLASS REQUEST FOR DECLARATORY JUDGMENT
### UNDER 28 U.S.C. § 2201

(Brought by members of the Balboa Debt Discharge Class against all Defendants)

138.   Plaintiff incorporates by reference the preceding paragraphs as if fully alleged herein.

139.   As described above, government investigations have repeatedly found that Corinthian made knowingly false representations that were intended to induce students such as Plaintiff and Class Members to rely on those false statements, to enroll with Corinthian, and to enter into the related student loan contracts.

140.   Plaintiff and Class Members justifiably relied upon the representations of Corinthian's representatives because Corinthian was in a position of control over information about its educational programs and services, and because it marketed itself as an institution that provided students with services including job-training and job-placement services useful in improving one's work-related earnings.

141.   As the result of Corinthian's actions, Plaintiff and Class Members have been damaged by the negative effects on their credit without cause, the anxiety resulting from not being able to obtain the types of jobs and level of employment income for which they enrolled in Corinthian's programs, and the anxiety resulting from not being able to repay their loans.

142.   The actions of Corinthian as described above constitute fraud in inducing Plaintiff and Class Members to enroll with Corinthian and borrow the student loans at issue.

143.   For the reasons stated above, Defendants are subject to the same claims to which Corinthian could be subject.

144.   A live and active controversy exists now between Plaintiff and Class Members on the one hand and Defendants on the other.   Corinthian's fraud, the legal violations pled in the preceding causes of action, and the injuries sustained by Plaintiff and Class Members as a result of the fraud and legal violations, justify a cancellation of the student loan contracts between the parties.   Defendants continue to collect on the student loan contracts even though the obligations of Plaintiff and Class Members under the student loan contracts should be terminated.

145.   Plaintiff and Class Members seek a declaration that the student loan contracts held by Balboa for student loans borrowed by Plaintiff and Class Members for their attendance or costs at a Corinthian school are voidable and hereby cancelled. Because the "benefit" received by Plaintiff and Class Members was negligible, Plaintiff and Class Members do not need to restore anything to Defendants as part of cancelling these contracts.

Whereas Plaintiff and Class Members pray for relief as follows:

1.   For an order declaring that the promissory notes evidencing the student loan obligations at issue are cancelled as of the date of judgment and no longer of any legal effect;

2.   For an order instructing Defendants to remove all negative credit information furnished to consumer reporting agencies related to the cancelled student loans;

3.   For an injunction barring all future attempts to collect on or otherwise enforce the student loan obligations at issue; and

4.   For such other relief as this Court deems proper.

## SIXTH CAUSE OF ACTION
## INDIVIDUAL VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT, 15 U.S.C. §§ 1692, *et seq.*
(Brought by Plaintiff Deborah Terrell against Defendants UAS and
Does 1 through 5, inclusive)

146.   Plaintiff incorporates by reference the preceding paragraphs as if fully alleged herein.

147.   Defendants violated the restrictions of 15 U.S.C. § 1692e through their behavior described herein, including but not limited to by threatening to seize Plaintiff's home and bank account contents if her student loan debt remains unpaid.

148.   Defendants violated the restrictions of 15 U.S.C. § 1692d through their behavior as described herein, including but not limited to by calling Plaintiff repeatedly and frequently within the short time periods described.

149.   Defendants' behavior described herein has damaged Plaintiff by negatively affecting her credit without cause, causing her anxiety resulting from the threats of losing her home and her limited income, and requiring her to take time away from work to address the collection.   The amount of the damages will be proven at trial.

150.   Defendants' actions described herein were willful and knowing.

151.   Plaintiff is entitled to statutory damages, costs, and attorney's fees, in addition to actual damages.

Whereas Plaintiff prays for relief as follows:

1.      For an award of actual damages to Plaintiff to be proven at trial;

2.      For an award of statutory damages to Plaintiff;

3.      For an award of costs of suit and attorney's fees as allowed by 15 U.S.C. § 1692k(a)(3); and

4.      For such other relief as this Court deems proper.

### SEVENTH CAUSE OF ACTION
**INDIVIDUAL VIOLATIONS OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT, California Civil Code § 1788, *et seq.***
(Brought by Plaintiff Deborah Terrell against Defendants UAS and
Does 1 through 5, inclusive)

152.   Plaintiff incorporates by reference the preceding paragraphs as if fully alleged herein.

153.   Defendants violated the restrictions of Civil Code § 1788.11 through their behavior as described herein, including but not limited to by calling Plaintiff repeatedly and frequently within the short time periods described, and threatening to seize Plaintiff's home and bank account contents if the debt remains unpaid.

154.   Defendants' behavior described herein has damaged Plaintiff by negatively affecting her credit without cause, causing her anxiety over the threats of losing her home and her limited income, and requiring her to take time away from work to address the collection.  The amount of the damages will be proven at trial.

155.   Defendants' violations of the Rosenthal Act were willful and knowing, thereby entitling plaintiff to statutory damages pursuant to Civil Code § 1788.30(b).

156.   Plaintiff is entitled to statutory damages, costs, and attorney's fees, in addition to actual damages.

Whereas Plaintiff prays for relief as follows:

1.     For an award of actual damages to Plaintiff to be proven at trial;

2.     For an award of statutory damages to Plaintiff;

3.     For an award of costs of suit and attorney's fees as allowed by Civil Code § 1788.30(c); and

4.     For such other relief as this Court deems proper.

Dated: July 14, 2016

Respectfully Submitted,
PUBLIC COUNSEL
Anne Richardson
Magdalena Reyes Bordeaux
Charles Evans
L. Adelaide Anderson

STRUMWASSER & WOOCHER LLP
Fredric D. Woocher
Jenna L. Miara
Dale Larson

HADSELL STORMER & RENICK LLP
Dan Stormer
Caitlan McLoon

By _____ /s/ Jenna L. Miara _____
                Jenna L. Miara

JURY TRIAL DEMANDED

Plaintiff, individually and on behalf of the Proposed Classes, demands a jury on all issues so triable.

Dated: July 14, 2016

Respectfully Submitted,
PUBLIC COUNSEL
Anne Richardson
Magdalena Reyes Bordeaux
Charles Evans
L. Adelaide Anderson

STRUMWASSER & WOOCHER LLP
Fredric D. Woocher
Jenna L. Miara
Dale Larson

HADSELL STORMER & RENICK LLP
Dan Stormer
Caitlan McLoon


By _____/s/ Jenna L. Miara_____
        Jenna L. Miara